CHAD C. SPRAKER
Assistant U.S. Attorney
PETER LEININGER
Special Assistant U.S. Attorney
U.S. Attorney's Office
901 Front Street, Suite 1100
Helena, MT 59626
Phone:  (406) 457-5120
FAX:  (406) 457-5130
Emails:    Chad.Spraker@usdoj.gov
                  Peter.Leininger@fda.hhs.gov



JUL 1 7 2015

Clerk, U S District Court
District Of Montana
Billings



ATTORNEY FOR PLAINTIFF
UNITED STATES OF AMERICA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>CANADADRUGS.COM LTD.<br>PARTNERSHIP,<br>THORKELSON CONSULTING,<br>LTD.,<br>4208081 CANADA, LTD.<br>ROCKLEY VENTURES, LTD.,<br>GLOBAL DRUG SUPPLY, LTD.,<br>RIVER EAST SUPPLIES, LTD.,<br>KRISTJAN THORKELSON,<br>THOMAS HAUGHTON,<br>RONALD SIGURDSON,<br>TROY NAKAMURA,<br>DARREN CHALUS,<br>NARINDER KAULDER, | CR 14-27-BU-DLC<br><br>**SUPERSEDING INDICTMENT**<br><br>**CONSPIRACY TO SMUGGLE GOODS INTO THE UNITED STATES**<br>(Count I)<br>Title 18 U.S.C. § 371<br>(Penalty: Five years imprisonment, $250,000 fine, and three years supervised release)<br><br>**SMUGGLING GOODS INTO THE UNITED STATES**<br>(Counts II-III)<br>Title 18 U.S.C. § 545<br>(Penalty: Twenty years imprisonment, $250,000 fine, and three years supervised release) |

1

| | |
|---|---|
| **JAMES TRUEMAN,**<br>**RAM KAMATH,**<br><br>      **Defendants.** | **CONSPIRACY TO COMMIT MONEY LAUNDERING**<br>**Title 18 U.S.C. § 1956(h)**<br>**(Count IV)**<br>**(Penalty:  Ten years imprisonment, $500,000 fine or, alternatively, twice the amount involved in the transaction, and three years supervised release)**<br><br>**INTERNATIONAL MONEY LAUNDERING**<br>**Title 18 U.S.C. § 1956(a)(2)(A)**<br>**(Counts V-VIII)**<br>**(Penalty:  Twenty years imprisonment, $500,000 fine or, alternatively, twice the amount involved in the transaction, and three years supervised release)**<br><br>**MONEY LAUNDERING –**<br>**TRANSACTION OVER $10,000**<br>**(Count IX)**<br>**Title 18 U.S.C. § 1957**<br>**(Penalty:  Ten years imprisonment, $250,000 fine or, alternatively, twice the amount involved in the transaction, and three years supervised release)**<br><br>**FORFEITURE ALLEGATION** |

At all times relevant to this Indictment:

### *GENERAL ALLEGATIONS*

1. The Food and Drug Administration ("FDA") was the agency of the United States responsible for regulating the manufacture, labeling, and distribution of drugs in the United States.  Among other things, the FDA was responsible for enforcing the provisions of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq*. ("FDCA"), including regulating the distribution of prescription drugs.

2.   A "drug" was defined by the FDCA as, among other things, any article intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; articles (other than food) intended to affect the structure or any function of the body of man or other animals; and articles intended for use as a component of any such articles.  *See* 21 U.S.C. § 321(g).

3. A "new drug" was defined by the FDCA as any drug that is "not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof...."  *See* 21 U.S.C. § 321(p)(1).

4.   A prescription drug was defined by the FDCA as "a drug intended for use by man which because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe except under the supervision of a practitioner licensed by law to administer such drug." 21 U.S.C. § 353(b)(1)(A).  A drug may also be limited to prescription use by its FDA-approved application.  *See* 21 U.S.C. § 353(b)(1)(B).

5.   Before a new drug could be introduced into interstate commerce, it must have been the subject of an approved application filed with the FDA.  *See* 21 U.S.C. § 331(d), 355(a).  FDA approval was not only for the molecular entity

itself (i.e. the active ingredient) but also included the manufacturing process and labeling. *See* 21 C.F.R. § 314.50(i).

6. FDA is responsible for regulating the manufacture, labeling, and distribution of all drugs shipped or received in interstate commerce, including the distribution of prescription drugs.  FDA's responsibilities include enforcing the FDCA's requirements that drugs bear labels and labeling that enable health care providers and consumers to use them in a safe manner and that the drugs are listed by and manufactured in facilities registered with the Secretary of the United States Department of Health and Human Services.  21 U.S.C. §§ 352(f), 352(o), 360(c), and 360(i).

7. The FDCA establishes that a drug is deemed to be "misbranded" if it does not meet certain requirements of the statute, including if its labeling fails to bear adequate directions for use, 21 U.S.C. § 352(f), if information required to appear on the label is not in the English language (unless distributed solely in Puerto Rico or certain U.S. territories), 21 U.S.C. § 352(c), 21 C.F.R. § 201.15(c)(1), or if a drug came from a foreign drug establishment and the drug was not annually listed with the FDA by that establishment as one of the drugs which was being manufactured for commercial distribution in the United States, 21 U.S.C. §§ 352(o), 360(j).  In the case of a prescription drug, a drug is also

misbranded if its label fails to bear the symbol "Rx only." 21 U.S.C. § 353(b)(4)(A); 21 C.F.R. § 201.100(b)(1).

8. The FDCA prohibits the introduction, or causing the introduction, of misbranded or unapproved new drugs into interstate commerce. 21 U.S.C. §§ 331(a), (d).

## *DEFENDANTS*

9. Defendants CANADADRUGS.COM LIMITED PARTNERSHIP, THORKELSON CONSULTING, LTD., AND 4208081 CANADA LTD. (collectively referred to as "CANADA DRUGS") were also known as "Canada Drugs" or "Canadadrugs.com" and were engaged in the illegal importation of unapproved new drugs, misbranded drugs, and counterfeit drugs for sale and distribution to physicians and physician office practices in the United States.

10.Defendant ROCKLEY VENTURES, LTD. ("ROCKLEY VENTURES") was a subsidiary of CANADA DRUGS based in Barbados that assisted in the illegal clinical drug distribution enterprise.

11. Defendant GLOBAL DRUG SUPPLY, LTD. ("GLOBAL DRUG SUPPLY") was a subsidiary of CANADA DRUGS based in Barbados that assisted in the illegal clinical drug distribution enterprise.

12. Defendant RIVER EAST SUPPLIES, LTD. ("RIVER EAST") was a subsidiary of CANADA DRUGS that was incorporated in the United Kingdom.

RIVER EAST shipped the unapproved new drugs, misbranded drugs, and counterfeit drugs into the United States on behalf of CANADA DRUGS. RIVER EAST falsified customs declarations that accompanied such shipments on behalf of CANADA DRUGS.

13. Defendant KRISTJAN ("KRIS") THORKELSON, was the CEO of THORKELSON CONSULTING, LTD., 4208081 CANADA, LTD., and CANADADRUGS.COM LIMITED PARTNERSHIP. THORKELSON was also listed as a Director of GLOBAL DRUG SUPPLY. THORKELSON orchestrated and profited from the CANADA DRUGS criminal enterprise.

14. Defendant THOMAS ("TOM") HAUGHTON was the President of ROCKLEY VENTURES and GLOBAL DRUG SUPPLY.

15. Defendant RONALD ("RON") SIGURDSON was the Chief Financial Officer of CANADA DRUGS, who assisted in the management of the company's criminal enterprise.

16. Defendant NARINDER KAULDER was the Head of Operations for RIVER EAST.

17. Defendant TROY NAKAMURA was a manager of illegal clinical drug sales for CANADA DRUGS and ROCKLEY VENTURES.

18. Defendant DARREN CHALUS was a manager of illegal clinical drug sales for CANADA DRUGS and ROCKLEY VENTURES.

19. Defendant JAMES ("JIM") TRUEMAN was paid by CANADA DRUGS to serve as a liaison between CANADA DRUGS and the drop-shippers in the United States.

20. Defendant RAM KAMATH was the Director of Pharmacy Policy and International Verifications for Company A.

### *CANADA DRUGS' IMPORTATION NETWORK*

#### Background

21. Defendants THORKELSON, HAUGHTON, SIGURDSON, NAKAMURA, CHALUS, KAULDER and TRUEMAN were officers, employees, or agents of several companies that operated under the name "CanadaDrugs.com," "CanadaDrugs.com Group of Companies," or "Canada Drugs," including Defendants THORKELSON CONSULTING, LTD., 4208081 CANADA, LTD., and CANADADRUGS.COM LIMITED PARTNERSHIP (hereinafter referred to collectively as "CANADA DRUGS"). CANADA DRUGS' business focused on the illegal importation and sale of prescription drugs that had not been approved by the FDA for use in the United States and were misbranded under the FDCA.

22. In 2001, Defendant THORKELSON founded CANADA DRUGS as an online pharmacy. CANADA DRUGS' consumer operations were focused on the illegal shipment of low cost, unapproved, and misbranded prescription drugs to Americans.

7

23. In approximately 2009, CANADA DRUGS began selling unapproved and misbranded prescription drugs directly to physicians and physician office practices in the United States. CANADA DRUGS built this component of its business through the acquisition of several companies that were already engaged in the illegal sale of unapproved and misbranded prescription drugs to physicians in the United States and establishing its own wholesale prescription drug brands.

24. In September of 2009, CANADA DRUGS began negotiating a drug sourcing arrangement with Montana Healthcare Solutions ("MTHCS"), a company based in Belgrade, Montana that specialized in the illegal sale of unapproved, misbranded prescription drugs to United States physicians. MTHCS was owned and operated by Montana resident, Paul Bottomley. Under the arrangement, CANADA DRUGS and MTHCS agreed to pool their purchasing power to obtain unapproved, misbranded prescription drugs for cheaper prices overseas.

25. As a part of its arrangement with MTHCS, CANADA DRUGS and several of its key subsidiaries signed a nondisclosure and confidentiality agreement with MTHCS and Paul Bottomley. Defendant THORKELSON executed the agreement on behalf of Defendant THORKELSON CONSULTING, LTD. (operating as "Canada Drugs"), and identified himself as CEO of the corporate entity. Defendant HAUGHTON executed the agreement on behalf of two CANADA DRUGS subsidiaries based in Barbados - Defendant GLOBAL DRUG

SUPPLY and Defendant ROCKLEY VENTURES.   HAUGHTON identified himself as President of both GLOBAL DRUG SUPPLY and ROCKLEY VENTURES.

26. In October of 2010, CANADA DRUGS purchased the MTHCS customer lists and inventory from Paul Bottomley for approximately $5,000,000. CANADA DRUGS made the purchase through its subsidiaries ROCKLEY VENTURES and GLOBAL DRUG SUPPLY.  The customer list was purchased by ROCKLEY VENTURES and the inventory was purchased by GLOBAL DRUG SUPPLY.  HAUGHTON, acting as President of GLOBAL DRUG SUPPLY and ROCKLEY VENTURES, executed the purchase agreements on behalf of both entities.

27. In the agreement, the parties acknowledged the risk that the business model of MTHCS was in violation of United States law:

Regulatory Compliance.  The Vendor is in good standing with all applicable legislative and regulatory authorities and maintains all valid and subsisting licenses required for the operation of its business and, except as has been disclosed to the Purchaser in writing, the Vendor has not received any direction, order, instruction, or restriction from any legislative or regulatory authority concerning the operation of the Vendor's Business or the use of the Purchased Assets.  **Excluding claims that importation of non-FDA-approved medications into the United States violates United States law, to the best of the knowledge of the Vendor, its existing business is not operated in direct violation of any law or regulation applicable to them . . . .**

(Emphasis added.)

28. The $5,000,000 payment was made into an account held by MTHCS at the First Montana Bank (located in the District of Montana). The payment was made by ROCKLEY VENTURES in a total of three installments. On October 19, 2010, ROCKLEY VENTURES sent a wire transfer in the amount of $3,500,000 from its account at the Royal Bank of Canada, Bridgetown Barbados, to the MTHCS account at First Montana Bank. On February 8, 2011, ROCKLEY VENTURES sent a wire transfer in the amount of $250,000 from its account at the Royal Bank of Canada, Bridgetown Barbados, to the MTHCS account at First Montana Bank. On February 11, 2011, ROCKLEY VENTURES sent a wire transfer in the amount of $1,250,000 from its account at the Royal Bank of Canada, Bridgetown Barbados, to the MTHCS account at First Montana Bank.

29. As discussed below, for several months following the purchase of MTHCS, CANADA DRUGS, through its subsidiaries ROCKLEY VENTURES and GLOBAL DRUG SUPPLY, continued to utilize accounts held by MTHCS at First Montana Bank to facilitate their illegal prescription drug distribution business.

## CANADA DRUGS' Sale of Unapproved, Misbranded Drugs

30. The unapproved and misbranded prescription drugs CANADA DRUGS sold to United States physicians included prescription drugs sold under various trade names, including: Aloxi, Avastin, Altuzan, Botox, Mabthera, Herceptin,

Neupogen, Eprex, Erbitux, Neulastim, Zometa, Gemzar, Venofer, Aclasta, Taxotere, Velcade.

31. Many of the drugs sold by CANADA DRUGS were used in conjunction with the treatment of cancer.

32. The drugs sold by CANADA DRUGS to United States physicians violated the FDCA in several different ways. For instance, the labeling for the prescription drugs sold by CANADA DRUGS to United States physicians was different than the versions of the prescription drugs that the FDA approved for sale in the United States, and the text on some of the labeling for some of the prescription drugs was in foreign languages. Other labeling failed to bear the symbol "Rx only" required for prescription drugs being distributed in the United States. 21 U.S.C. § 353(b)(4)(A); 21 C.F.R. § 201.100(b)(1).

33. In addition, the vast majority, and possibly all, of the prescription drugs sold by CANADA DRUGS were not approved by the FDA. For example, CANADA DRUGS sold a prescription drug labeled as "Altuzan," with the active ingredient bevacizumab, to United States physicians. Altuzan is not approved by the FDA and it is not listed by the manufacturer as a drug meant for sale in the United States. The FDA-approved prescription drug with the active ingredient bevacizumab is sold under the name "Avastin."

34. CANADA DRUGS sold these, and other, unapproved, misbranded prescription drugs to physicians in the United States at a significant discount, with the assurance to its customers that the drugs were safe. However, CANADA DRUGS purchased its inventory from questionable sources and ultimately sold counterfeit versions of the drugs Altuzan and Avastin to physicians in the United States.

## CANADA DRUGS' Smuggling Scheme

35. CANADA DRUGS conducted its clinical sales through several subsidiaries, including ROCKLEY VENTURES, GLOBAL DRUG SUPPLY, and RIVER EAST. Executives at CANADA DRUGS, however, remained heavily involved in the operation of the clinical business.

36. CANADA DRUGS used drop-shippers in the United States to facilitate the illegal distribution of unapproved and misbranded drugs in the United States. CANADA DRUGS would coordinate the shipment of clinical drugs from RIVER EAST in the United Kingdom to drop-shippers in Illinois (Company B), Washington (Company C), and Tennessee (Company D).

37. CANADA DRUGS paid Defendant TRUEMAN a share of its profits to help coordinate its shipping activities. TRUEMAN served as a liaison between CANADA DRUGS and the drop-shippers in Illinois and Washington.

38. The drop-shippers maintained CANADA DRUGS' inventory of clinical drugs, while CANADA DRUGS and TRUEMAN managed the inventory and facilitated the sale of the drugs to physicians and physician offices and then coordinated the delivery of the drugs from the United States-based drop-shippers to customers.

39. The drop-shippers were not, however, experienced in the storage and distribution of clinical drugs, particularly drugs that were required to be consistently stored at cold temperatures ("cold-chain drugs"). Some of the cancer medications sold by Canada Drugs were cold-chain drugs.

40. As a result, although CANADA DRUGS tried to make it appear that its cold-chain drugs were consistently stored at the correct temperature, CANADA DRUGS had persistent temperature control problems, and cold-chain products were often delivered to customers warm, causing frequent returns.

41. Moreover, instead of automatically disposing of the drugs that had been returned by customers after they arrived warm, CANADA DRUGS often re-refrigerated the returned merchandise, so it could be sold to other customers.

42. The cold-chain delivery problems were brought to the attention of the executive management at CANADA DRUGS. Customer complaints were not only forwarded to Clinical Managers such as NAKAMURA and CHALUS, but also to SIGURDSON, the CFO of CANADA DRUGS. The cold-chain delivery problems

were not isolated to CANADA DRUGS' drop-shipper in Illinois.   CANADA DRUGS experienced similar cold-chain delivery issues with Company C, its drop-shipper in Washington.

### CANADA DRUGS' Falsification of Customs Declarations

43.  In order to ensure that the illegal shipments of clinical drugs were allowed into the United States without increased scrutiny from the FDA and United States customs, RIVER EAST systematically falsified the customs declarations that accompanied the illegal drug shipments.

44.  RIVER EAST routinely declared the value of its shipments to be slightly less than $2,000, a threshold that would trigger a formal customs entry for the package and increased scrutiny from United States customs.

45.  The executive leadership at CANADA DRUGS was aware of the falsification of customs declarations at RIVER EAST.   On March 8, 2011, a licensed customs broker for Company B raised concerns about the illegal smuggling of clinical drugs into the United States and the false declarations that accompanied each shipment.   In an email to TRUEMAN, the customs broker asked whether the clinical drugs were FDA approved and whether the customs declarations were being falsified:

> *Jim,*
>
> *For the last year or so as your inventory here at [Company B] has begun to grow I have been getting concerned about following the proper*

*importing channels. I received the attached today about a seizure of unapproved drugs by the FDA. In regards to your shipments they seem to appear in the US Mail daily and of course [Company B] is acting as a warehouse agent but I am wondering about the following:*

1. *Do your Botox related items have FDA Approval?*
2. *Are these items cleared through U.S. customs?*

*I have also noticed as per the attached customs declaration the value of the shipment is always around $2,000.00. Is this correct, I am thinking the merchandise is worth a lot more? I feel we need to talk about this because both [Company B] and yourself can get in a lot of trouble if the proper channels are not being followed.*

46. The customs broker attached a customs declaration to his email that had accompanied a shipment containing 50 units of Botox. The shipment had a declared value of $1,899. However, CANADA DRUGS' acquisition price (not the value at which the goods would ultimately be sold in the United States) for Botox was approximately $288 per unit. Therefore, the value of the shipment, merely based on the approximate acquisition price of the goods, was over $14,000.

47. TRUEMAN forwarded the customs broker's email to Defendant SIGURDSON, the Chief Financial Officer of CANADA DRUGS, who responded: "We are discussing this issue internally in the morning and then we will get back to you."

48. On March 10, 2011, TRUEMAN suggested sending the illegal drugs to Company C, in Washington, if Company B's concerns could not be addressed.

49. The same day, SIGURDSON rejected TRUEMAN's suggestion, and noted that "Darren and Troy" would be drafting a response to Company B:

*Jim,*

*I don't really see [Company C] as a realistic solution at this point. At least, not until we test it out more fully. We need to get [Company B] onside. I have asked Darren and Troy to draft a response for you to share with Terry. Hopefully, it will be ready in a couple hours.*

*Ron*

50. SIGURDSON'S email appears to be referencing Defendants NAKAMURA, and CHALUS, who were clinical managers that assisted in the operation of CANADA DRUGS' illegal clinical drug distribution business.

51. On March 11, 2011, SIGURDSON explained to TRUEMAN that the "team" at CANADA DRUGS had not been able to provide satisfactory answers to the questions about FDA approval and the falsification of declarations:

*Jim,*

*I didn't receive much in the way of useful information from the team here to help address [Company B's] concerns. We do know all the products are clearing US customs on their way into [Company B]. I'm not sure what else you should communicate to [Company B] on this topic.*

*Ron*

52. On March 11, 2011, SIGURDSON also forwarded TRUEMAN a draft response that contained misleading assurances to [Company B] that United States customs and the FDA "work together to ensure compliance with US laws and

regulations" and "if there were any further requirements or issues, we would be notified before the product would be let into the United States." The draft response asserted that "[w]e are following all the requirements that we need for us to stay compliant."

53. In his email to TRUEMAN, SIGURDSON acknowledged that the response to Company B did not address the falsification of customs declarations, and explained that the company was "still looking into it." SIGURDSON wrote:

*We haven't addressed the declared value issue as we are still looking into it. We may need to vary the declared value to address this issue.*

54. TRUEMAN forwarded SIGURDSON's response to Company B.

### CANADA DRUGS' Sale of Counterfeit Altuzan

55. CANADA DRUGS misled its customers about the safety of the drugs it sold. Although CANADA DRUGS represented to customers that the drugs for sale were safe and manufactured in "FDA-approved" facilities overseas, CANADA DRUGS was in fact purchasing their drugs from questionable sources that ultimately supplied CANADA DRUGS with counterfeits. The reality was that CANADA DRUGS did not know where the drugs it purchased were being manufactured, or who had been handling the drugs it purchased prior to delivery.

56. CANADA DRUGS purchased counterfeit cancer drugs from two separate suppliers. The first was a United Kingdom citizen, Individual A. From

approximately 2008-2011, Individual A was one of CANADA DRUGS' competitors in the illegal sale of clinical drugs in the United States.

57. In approximately May of 2011, United States law enforcement authorities executed a search warrant at the offices of Individual A's primary distributor in the United States. As that investigation moved forward, Individual A retreated from the criminal enterprise of illegal prescription drug distribution and he arranged for the sale of his inventory and his customer list to CANADA DRUGS.

58. Defendant KAULDER, who is the Head of Operations for RIVER EAST, assisted in CANADA DRUGS' purchase of inventory from Individual A. The invoice from the sale of Individual A's inventory, which is dated July 7, 2011, indicates the inventory was purchased for a total of £135,325.11, and was delivered to RIVER EAST at W Block Beeston Business Park, Technology Drive, Beeston, Nottingham, NG9 1LA.

59. The inventory that RIVER EAST purchased from Individual A included 82 units of Altuzan. The Altuzan supplied by Individual A included counterfeit versions of the drug. RIVER EAST shipped the counterfeit Altuzan supplied by Individual A to at least one physician in the United States. That physician submitted the Altuzan he purchased from RIVER EAST to the FDA, and subsequent lab tests confirmed that the Altuzan was counterfeit.

### CANADA DRUGS' Sale of Counterfeit Avastin

60.  CANADA DRUGS was also responsible for a second counterfeit drug incident.  The second incident involved a counterfeit version of Avastin (the first counterfeit duplicated the Turkish version of the drug; the second counterfeit duplicated the United States version).

61.  CANADA DRUGS purchased the counterfeit Avastin from Company E, a Danish company.  The owner of Company E was a questionable source who was affiliated with illegal drug importation activities long before he sold the counterfeit Avastin to CANADA DRUGS in 2011.

62.  From September to November 2011, Company E supplied RIVER EAST with 167 packs of Avastin 400 mg, lot number B6011B02.

63.  On or around November 21, 2011, Company E contacted KAULDER and asked him to quarantine and return any stock of Avastin B6011B02. KAULDER was told that the original vials of Avastin might have been replaced with Altuzan by a supplier in Egypt.

64.  At that point, RIVER EAST had already sent approximately 41 packs of the suspect Avastin to its drop-shipper in Tennessee, Company D.  RIVER EAST had also sent several packs to Company B in Illinois.

65. RIVER EAST contacted Company D about the suspect Avastin, and Company D confirmed that it had sold approximately 36 packs of the suspect Avastin to physicians in the United States.

66. After CANADA DRUGS discovered that there had been a significant breach in its supply chain, and possible counterfeit cancer drugs were sitting in its warehouses in the United States, CANADA DRUGS moved to conceal the problem.

67. In early December 2011, HAUGHTON informed KAMATH that his company was recalling some Avastin and asked KAMATH if he could store it in his house for a period of time. KAMATH lived in Downers Grove, Illinois, not far from CANADA DRUGS' Illinois warehouse. KAMATH agreed to store the drugs on behalf of HAUGHTON.

68. KAMATH had become acquainted with HAUGHTON by virtue of KAMATH's affiliation with Company A. KAMATH's role at Company A was to conduct inspections of storage facilities maintained on behalf of internet pharmacies, including CANADA DRUGS.

69. The internet pharmacy industry funneled benefits to KAMATH through the inspections he conducted. In exchange, KAMATH would help provide them with the veneer of legitimacy that comes with having been inspected by an "independent" party.

70. For example, immediately prior to receiving HAUGHTON's early December 2011 call, KAMATH had been on an all-expenses-paid trip to Barbados for an inspection of CANADA DRUGS' facilities in Barbados. HAUGHTON selected the inspection date in advance, and arranged for KAMATH to stay in a four-star hotel, the Colony Club. In addition to being reimbursed for the airfare and the four-star accommodations, Company A also received a fee of $3,295 for KAMATH's inspection service.

71. On December 8, 2011, Company B shipped KAMATH five packs of Avastin lot number B6011B02, and two packs of Avastin lot number B6017B01. KAMATH stored the suspect Avastin in a refrigerator in his garage until it was picked up from his house and shipped elsewhere.

72. On December 24, 2011, KAMATH emailed HAUGHTON his inspection report from his recent trip to Barbados. KAMATH did not mention the recent Avastin incident in his email or in the report. In fact, KAMATH found that CANADA DRUGS' facility was in compliance with all of Company A's "Drug Safety" requirements, including the requirement that "the pharmacy must ensure quality of supply to guarantee authenticity of medications." With respect to that requirement, KAMATH, who had just stored counterfeit Avastin in his garage on behalf of HAUGHTON, included the following note about CANADA DRUGS'

operations: "Medications are procured from the wholesale operation of the parent company, which obtains all supplies directly from the manufacturer."

<u>Counterfeit Avastin Comes to the Attention of Authorities</u>

73. After CANADA DRUGS discovered that there had been a serious breach of its supply chain and it might have distributed counterfeit Avastin to physicians in the United States, CANADA DRUGS made no attempt to notify FDA or any other authorities. The appearance of potential counterfeit cancer medications was reported by a different company in the supply chain, not CANADA DRUGS.

74. In early December, 2011, the Danish Health and Medicines Authority notified the United Kingdom's Medicines and Healthcare Product Regulatory Agency ("MHRA") that RIVER EAST might be in possession of counterfeit Avastin. On or about December 14, 2011, MHRA conducted an inspection of RIVER EAST and collected the suspect Avastin. During an interview with MHRA, KAULDER confirmed purchasing the suspect Avastin from Company E and distributing it to the United States.

75. However, at that point, CANADA DRUGS did not stop selling unapproved, misbranded drugs to physicians in the United States. CANADA DRUGS continued its illegal clinical drug distribution scheme until February of

2012, when it became clear the FDA was investigating the company's involvement in distributing counterfeit Avastin to physicians in the United States.

<u>CANADA DRUGS' Efforts to Evade US Law Enforcement</u>

76.  On February 14, 2012, after receiving laboratory confirmation that counterfeit Avastin was distributed in the United States, the FDA posted a notice on its website to physicians warning about the suspect suppliers and lots.

77.  On February 15, 2012, in an attempt to evade United States law enforcement authorities, CANADA DRUGS ordered Company B to send all of its inventory back to RIVER EAST in the United Kingdom.  When questioned about this move, Defendant NAKAMURA, who coordinated clinical sales on behalf of CANADA DRUGS, wrote that "[w]e want to be extra careful and want to see what happens with the investigation.  We hope to return back to normal as soon as we know more."

78.  In another email, NAKAMURA wrote: "Yes - it is a lot to send back, but our execs want to be on the safe side.  I will talk to you further as soon as possible."

79.  On February 16, 2012, NAKAMURA wrote, "[w]e are hoping that all will be back to normal in a couple of weeks.  We just don't want Oncology stock sitting in the US . . . ."

80. Later in the day, NAKAMURA noted to TRUEMAN that "the investigation has expanded to FDA."

81. NAKAMURA explained that "[w]e don't know how wide the investigation is going to be and therefore don't know if they are going to investigate all Avastin or all Onco???" He confirmed that Company B should stop shipping orders, but stated that "[Company C] should continue as normal."

82. Pursuant to the request of CANADA DRUGS, Company B shipped approximately 1,100 units of various unapproved, misbranded clinical drugs back to RIVER EAST in the United Kingdom.

<u>CANADA DRUGS' Gross Proceeds from its Illegal Activities</u>

83. From 2009 until 2012, CANADA DRUGS profited heavily from its criminal enterprise. During that time, CANADA DRUGS generated at least $78 million in gross proceeds from the illegal sale of unapproved new drugs, misbranded drugs, and counterfeit drugs in the United States.

84. CANADA DRUGS systematically moved its proceeds from accounts in the United States to accounts in Barbados, and then ultimately transferred the profits to accounts in Canada.

85. Two accounts CANADA DRUGS utilized to further its illegal enterprise were held by MTHCS at First Montana Bank. For several months following the sale of MTHCS to ROCKLEY VENTURES and GLOBAL DRUG

SUPPLY, physicians who purchased illegal pharmaceutical drugs from CANADA DRUGS continued to make payment for such drugs to MTHCS. MTHCS deposited checks from physicians into its accounts at First Montana Bank. MTHCS then sent international wire transfers to ROCKLEY VENTURES' account at the Royal Bank of Canada, Bridgetown Barbados.

86. For example, on November 8, 2010, MTHCS wired $272,272.21 to ROCKLEY VENTURES' account at the Royal Bank of Canada, Bridgetown, Barbados. On November 16, 2010, MTHCS wired $153,276.52 to ROCKLEY VENTURES' account at the Royal Bank of Canada, Bridgetown, Barbados. On March 15, 2011, MTHCS wired $1,062,896.04 to ROCKLEY VENTURES' account at the Royal Bank of Canada, Bridgetown, Barbados. The wire transfers continued regularly until approximately June of 2011. From 2010 to 2011, MTHCS wired a total of approximately $11,635,109.35 in gross proceeds to ROCKLEY VENTURES' account in Barbados.

87. CANADA DRUGS also utilized credit card processors and electronic funds transfers to promote its illegal enterprise and facilitate the transfer of funds from the United States to Barbados and then to CANADA DRUGS' accounts in Canada.

88. In total, CANADA DRUGS facilitated the transfer of at least $78,184,482 in gross proceeds from its illegal enterprise into bank accounts held by ROCKLEY VENTURES in Barbados.

89. Once the gross proceeds were transferred to ROCKLEY VENTURES, the profits were then transferred to CANADA DRUGS' bank accounts in Canada.

## COUNT I

18 U.S.C. § 371

(Conspiracy to Smuggle Goods into the United States)

90. Paragraphs 1 through 89 of the preceding sections are re-alleged and incorporated by reference as though fully set forth herein.

### The Conspiracy and Its Objects

91. From 2009 and continuing to in or around March of 2012, in the District of Montana and elsewhere, the Defendants, CANADA DRUGS, ROCKLEY VENTURES, GLOBAL DRUG SUPPLY, RIVER EAST, KRISTJAN THORKELSON, THOMAS HAUGHTON, RONALD SIGURDSON, NARINDER KAULDER, TROY NAKAMURA, DARREN CHALUS, JAMES TRUEMAN, and RAM KAMATH, knowingly conspired and agreed with each other and with persons known and unknown to the grand jury, including but not limited to Paul Bottomley and MTHCS, to commit offenses against the United States, that is,

26

(a)     fraudulently and knowingly importing and bringing into the United States merchandise contrary to law, specifically unapproved new drugs, and misbranded prescription drugs in violation of 21 U.S.C. § 331(a) and 21 U.S.C. § 331(d), all in violation of 18 U.S.C. § 545.

(b)     fraudulently and knowingly importing and bringing into the United States merchandise contrary to law, specifically merchandise imported into the United States by means of false customs declarations in violation of 18 U.S.C. § 542, all in violation of 18 U.S.C. § 545.

(c)     fraudulently and knowingly facilitating the transportation, concealment, and sale of merchandise brought into the United States contrary to law, specifically unapproved new drugs and misbranded prescription drugs in violation of 21 U.S.C. § 331(a) and 21 U.S.C. § 331(d), knowing the same to have been imported and brought into the United States contrary to law, all in violation of 18 U.S.C. § 545.

(d)     fraudulently and knowingly facilitating the transportation, concealment, and sale of merchandise brought into the United States contrary to law, specifically merchandise imported into the United States by means of false customs declarations in violation of 18 U.S.C. § 542, knowing the same to have been imported and brought into the United States contrary to law, all in violation of 18 U.S.C. § 545.

27

Manner and Means of the Conspiracy

In furtherance of the conspiracy, Defendants and others known and unknown to the Grand Jury employed, among others, the following manner and means:

92. It was part of the conspiracy that, beginning in or around 2009, members of the conspiracy would purchase prescription drugs that were not approved by the FDA and were misbranded under the FDCA, in order to profit from the sale of such drugs to physicians in the United States.

93. It was further part of the conspiracy that members of the conspiracy would ship the unapproved and misbranded drugs from the United Kingdom to drop-shippers in the United States.

94. It was further part of the conspiracy that members of the conspiracy would facilitate the transportation of unapproved drugs and misbranded drugs in the United States, including the delivery of the drugs to physicians in the United States, coordinating inventory of the drugs, and coordinating returns of the drugs.

Overt Acts

95. In or around September of 2009, members of the conspiracy entered into a non-disclosure and confidentiality agreement with Paul Bottomley and MTHCS in an attempt to facilitate their agreement to pool their purchasing power and obtain unapproved and misbranded drugs for cheaper prices.  Defendant THORKELSON executed the non-disclosure and confidentiality agreement on

behalf of Defendant THORKELSON CONSULTING, LTD. (doing business as CANADA DRUGS). Defendant HAUGHTON executed the agreement on behalf of Defendant ROCKLEY VENTURES.

96. In or around October of 2010, members of the conspiracy purchased, and facilitated the purchase, of MTHCS from Paul Bottomley for approximately $5,000,000 to secure the customer list and inventory of MTHCS. Defendant HAUGHTON executed the agreement on behalf of Defendants ROCKLEY VENTURES and GLOBAL DRUG SUPPLY.

97. To complete the purchase, Defendant ROCKLEY VENTURES effectuated three separate wire transactions from its Royal Bank of Canada account in Barbados to an account held by MTHCS at First Montana Bank:

(a)    On or around October 19, 2010, Defendant ROCKLEY VENTURES wired $3,500,000 to an account held by MTHCS at First Montana Bank.

(b)    On or around February 8, 2011, Defendant ROCKLEY VENTURES wired $250,000 to an MTHCS account at First Montana Bank.

(e)    On or around February 11, 2011, Defendant ROCKLEY VENTURES wired $1,250,000 to an MTHCS account at First Montana Bank.

98. To further the conspiracy, RIVER EAST would intentionally include false information (namely, the value of the goods being shipped) on the customs declarations that accompanied the shipments from the United Kingdom to the

United States.  These actions furthered the conspiracy by misleading United States Customs and therefore causing United States Customs and the United States Food and Drug Administration to apply less scrutiny to the shipments.

99.  To further the conspiracy, in March of 2011, SIGURDSON, CHALUS, NAKAMURA, and TRUEMAN, attempted to convince employees of Company B to continue shipping the unapproved and misbranded drugs to physicians even though those employees voiced concerns about the illegal nature of the activity, and potential liability for smuggling.  In order to quell the concerns of Company B, and to continue the criminal conspiracy, TRUEMAN, forwarded misleading and deceptive assurances to the drop-shipper that United States Customs and the United States Food and Drug Administration "ensure compliance" at the border and that "[w]e are following all the requirements that we need for us to stay compliant."

100.   In or around July of 2011, THORKELSON, SIGURDSON, and KAULDER purchased, or facilitated the purchase, of unapproved drugs and misbranded drugs from Individual A, in addition to Individual A's customer list. In conjunction with the purchase, Individual A sold Defendant RIVER EAST approximately 82 packs of Altuzan lot B6021.

101.   Following the purchase of Altuzan from Individual A, RIVER EAST shipped Altuzan lot B6021 to Company B, for distribution to physicians in the United States.

102.   In or around September, October and November of 2011, RIVER EAST, purchased and received approximately 167 packs of Avastin lot B6011 from Company E.

103.   Following the purchase of Avastin lot B6011 from Company E, RIVER EAST shipped the Avastin to Company D, in Tennessee.

104.   Following the purchase of Avastin lot B6011 from Company E, RIVER EAST shipped the Avastin to Company B, in Illinois.

105.   After HAUGHTON became aware that some of the Avastin RIVER EAST sent to the United States might be counterfeit, he sent the suspect Avastin being held at Company B to KAMATH, who stored the suspect Avastin in his garage.

106.   After the FDA posted a notice on its website about the counterfeit Avastin that was distributed in the United States, persons known and unknown to the grand jury, including NAKAMURA and TRUEMAN, attempted to conceal the smuggling by immediately coordinating the shipment of all remaining unapproved and misbranded drugs from Company B to RIVER EAST in the United Kingdom.

107.   To further the conspiracy, persons known and unknown to the grand jury systematically coordinated shipments of unapproved and misbranded drugs from RIVER EAST in the United Kingdom to Company B in the United States, including the following shipments:

| Drug | Approx.Date Received |
| --- | --- |
| Altuzan | 12/17/10 |
| Altuzan | 1/25/11 |
| Altuzan | 4/29/11 |
| Altuzan | 8/1/11 |
| Altuzan | 9/19/11 |
| Altuzan | 9/20/11 |
| Altuzan | 9/26/11 |

108.   To further the conspiracy, persons known and unknown to the grand jury systematically coordinated the shipment of unapproved and misbranded drugs from Company B in Illinois to physicians throughout the United States, including the following shipments:

| Drug | Recipient | Approx. Date Shipped |
| --- | --- | --- |
| Altuzan | Physician A Adventura, FL | 8/22/11 |
| Altuzan | Physician B Fremont, CA | 8/9/11 |

| | | |
|---|---|---|
| Altuzan | Physician C<br>Greeneville, TN | 11/7/11 |

All in violation of Title 18, United States Code, Section 371.

## COUNTS II-III

18 U.S.C. § 545

(Smuggling Goods into the United States)

109.   Paragraphs 1 through 108 of the preceding sections are re-alleged and incorporated by reference as though fully set forth herein.

110.   On or about the dates set forth below, Defendants CANADA DRUGS, ROCKLEY VENTURES, GLOBAL DRUG SUPPLY, RIVER EAST, KRISTJAN THORKELSON, THOMAS HAUGHTON, RONALD SIGURDSON, NARINDER KAULDER, TROY NAKAMURA, DARREN CHALUS, and JAMES TRUEMAN, in the District of Montana and elsewhere, fraudulently and knowingly imported into the United States unapproved and misbranded drugs contrary to law, and facilitated the transportation, concealment, and sale of unapproved and misbranded drugs after importation into the United States, knowing the same to have been imported and brought into the United States contrary to law:

| Count | Drug | Recipient | Approx. Date Shipped |
|---|---|---|---|
| II | Altuzan | Physician D | 11/29/10 |

(Payment for the shipment of foreign drugs was made to an account in the First Montana Bank.)

III          Altuzan          Physician D          1/14/11

(Payment for the shipment of foreign drugs was made to an account in the First Montana Bank.)

All in violation of Title 18, United States Code, Section 545, and Title 18 United States Code, Section 2.

Counts II-III are subject to a *Pinkerton* theory of liability.

## **COUNT IV**

### 18 U.S.C. § 1956(h)

### (Conspiracy to Commit Money Laundering)

111.   Paragraphs 1 through 110 of the preceding sections are re-alleged and incorporated by reference as though fully set forth herein.

### The Conspiracy and Its Objects

112.   From 2009 and continuing to in or around June of 2011, in the District of Montana and elsewhere, the Defendants, CANADA DRUGS, GLOBAL DRUG SUPPLY, ROCKLEY VENTURES, RIVER EAST, KRISTJAN THORKELSON, THOMAS HAUGHTON, RONALD SIGURDSON, and NARINDER KAULDER, knowingly conspired and agreed with other persons known and unknown to the grand jury, including Paul Bottomley and MTHCS, to commit offenses against the United States, that is,

34

(a)     To knowingly transport, transmit, and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, that is, the knowing importation into the United States of merchandise contrary to law, in violation of Title 18, United States Code, Section 545; in violation of Title 18, United States Code, Section 1956(a)(2)(A).

(b)     To knowingly engage in monetary transactions in criminally derived property of a value greater than $10,000 and derived from specified unlawful activity; that is, the knowing importation into the United States of merchandise contrary to law, in violation of Title 18, United States Code, Section 545; in violation of Title 18, United States Code, Section 1957.

<u>Manner and Means of the Conspiracy</u>

113.  It was part of the conspiracy that Defendants CANADA DRUGS, GLOBAL DRUG SUPPLY, ROCKLEY VENTURES, RIVER EAST, KRISTJAN THORKELSON, THOMAS HAUGHTON, RONALD SIGURDSON, and NARINDER KAULDER transferred, or assisted in the transfer of, proceeds from the illegal sale of unapproved and misbranded drugs from bank accounts in the

United States to bank accounts in Barbados, and then ultimately transferred, or assisted in the transfer of, the profits to bank accounts in Canada.

<u>Overt Acts</u>

114. In September of 2009, CANADA DRUGS entered into a drug sourcing arrangement with MTHCS, which was owned and operated by Montana resident, Paul Bottomley.   Under the arrangement, CANADA DRUGS and MTHCS agreed to pool their purchasing power to obtain unapproved, misbranded prescription drugs for cheaper prices overseas.

115. Following the 2009 agreement, Paul Bottomley began coordinating large wire transfers to RIVER EAST and GLOBAL DRUG SUPPLY in exchange for a supply of unapproved, misbranded prescription drugs.

116. On or about March 19, 2010, Bottomley wired $25,380.05 from account number XXXXX4540, held by MTHCS at First Montana Bank, to account number XXXX8803, held by RIVER EAST at Lloyds TSB Bank, PLC, Nottingham, England.

117. On or about August 20, 2010, Bottomley wired $367,696.85 from account number XXXXX4540, held by MTHCS at First Montana Bank, to account number XXX2089, held by GLOBAL DRUG SUPPLY, at the Royal Bank of Canada, Bridgetown, Barbados.   Defendant HAUGHTON, President of GLOBAL

DRUG SUPPLY, was a designated signing officer for account number XXX2089 at the Royal Bank of Canada, Bridgetown Barbados.

118.   In October 2010, CANADA DRUGS purchased MTHCS through its subsidiaries, ROCKLEY VENTURES and GLOBAL DRUG SUPPLY.

119.   Following CANADA DRUGS' purchase of MTHCS, Defendants CANADA DRUGS, GLOBAL DRUG SUPPLY, ROCKLEY VENTURES, KRISTJAN THORKELSON, THOMAS HAUGHTON, and RONALD SIGURDSON, continued to utilize MTHCS bank accounts at the First Montana Bank to manage some of the proceeds of specified unlawful activity, that is, the sale, transportation, and concealment of merchandise imported into the United States contrary to law.

120.   On or about October 15, 2010, Paul Bottomley wired $236,727.99 from account number XXXXX4540, held by MTHCS at First Montana Bank, to account number XXX2089, held by GLOBAL DRUG SUPPLY, at the Royal Bank of Canada, Bridgetown, Barbados.

121.   On or about November 8, 2010, Paul Bottomley wired $272,272.21 from account number XXXXX4540, held by MTHCS at First Montana Bank, to account number XXX5231, held by ROCKLEY VENTURES at the Royal Bank of Canada, Bridgetown Barbados.

122.   On or about November 16, 2010, Paul Bottomley wired $153,276.52 from account number XXXXX4540, held by MTHCS at First Montana Bank, to account number XXX5231, held by ROCKLEY VENTURES at the Royal Bank of Canada, Bridgetown, Barbados.

123.   On or about December 2 2010, $1,000,000 was wired from account number XXX5231, held by ROCKLEY VENTURES at the Royal Bank of Canada, Bridgetown Barbados, to account number XXXX-XXX4500, held by 4208081 CANADA LTD at TD Canada Trust, Calgary, Canada.  The description included for the wire was "Dividend Pymt 4208081."

124.   On or about March 15, 2011, Paul Bottomley wired $1,062,896.04 from account number XXXXX4540, held by MTHCS at First Montana Bank to account number XXX5231, held by ROCKLEY VENTURES at the Royal Bank of Canada, Bridgetown, Barbados.

125.   On or about May 9, 2011, $1,000,000 was wired from account number XXX5231, held by ROCKLEY VENTURES at the Royal Bank of Canada, Bridgetown, Barbados, to account number XXXX-XXX4500, held by 4208081 CANADA LTD at TD Canada Trust, Calgary, Canada.  The description included for the wire was "Distribution of Dividends."

126.   On or about May 16, 2011, Paul Bottomley wired $402,836.08 from account number XXXXX4540, held by MTHCS at First Montana Bank to account

number XXX5231, held by ROCKLEY VENTURES at the Royal Bank of Canada, Bridgetown, Barbados.

127.   On or about September 27, 2011, $1,500,000 was wired from account number XXX5231, held by ROCKLEY VENTURES at the Royal Bank of Canada, Bridgetown, Barbados, to account number XXXX-XXX4500, held by 4208081 CANADA LTD at TD Canada Trust, Calgary, Canada.  The description included for the wire was "Dividends Profits."

128.   On or about October 19, 2011, $1,200,000 was wired from account number XXX5231, held by ROCKLEY VENTURES at the Royal Bank of Canada, Bridgetown, Barbados, to account number XXXX-XXX4500, held by 4208081 CANADA LTD at TD Canada Trust, Calgary, Canada.  The description included for the wire was "Dividends Profits."

129.   On or about January 20, 2012, $1,000,000 was wired from account number XXX5231, held by ROCKLEY VENTURES at the Royal Bank of Canada, Bridgetown, Barbados, to account number XXXX-XXX4500, held by 4208081 CANADA LTD at TD Canada Trust, Calgary, Canada.  The description included for the wire was "Dividends Profits."

## COUNTS V-VIII

18 U.S.C. § 1956(a)(2)(A)

(International Money Laundering)

130.   Paragraphs 1 through 129 of the preceding sections are re-alleged and incorporated by reference as though fully set forth herein.

131.   In the District of Montana and elsewhere, Defendants, CANADA DRUGS, GLOBAL DRUG SUPPLY, ROCKLEY VENTURES, KRISTJAN THORKELSON, THOMAS HAUGHTON, and RONALD SIGURDSON, knowingly transported, transmitted, and transferred a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, that is, the knowing importation into the United States of merchandise contrary to law, in violation of Title 18, United States Code, Section 545; in violation of Title 18, United States Code, Section 1956(a)(2)(A).

132.   In or around October of 2010, CANADA DRUGS purchased MTHCS from Paul Bottomley for approximately $5,000,000 to secure the customer list and inventory of MTHCS and expand CANADA DRUGS' illegal prescription drug distribution business.  CANADA DRUGS purchased MTHCS through its subsidiaries, ROCKLEY VENTURES and GLOBAL DRUG SUPPLY.

Defendant HAUGHTON executed the agreement on behalf of Defendants ROCKLEY VENTURES and GLOBAL DRUG SUPPLY.

133. To complete the purchase, Defendant ROCKLEY VENTURES effectuated three separate wire transactions from its Royal Bank of Canada account in Barbados to an account held by MTHCS at First National Bank of Montana:

Count V:     On or around October 19, 2010, Defendant ROCKLEY VENTURES wired $3,500,000 from account number XXX5231 at the Royal Bank of Canada, Bridgetown, Barbados, to account number XXXXX4540 at First Montana Bank, held by MTHCS.

Count VI:    On or around February 8, 2011, Defendant ROCKLEY VENTURES wired $250,000 from account number XXX5231 at the Royal Bank of Canada, Bridgetown, Barbados, to account number XXXXX4540 at First Montana Bank, held by MTHCS.

Count VII:   On or around February 11, 2011, Defendant ROCKLEY VENTURES wired $1,250,000 from account number XXX5231 at the Royal Bank of Canada, Bridgetown, Barbados, to account number XXXXX4540 at First Montana Bank, held by MTHCS.

134. Following CANADA DRUGS' purchase of MTHCS, CANADA DRUGS continued to utilize the bank accounts held by MTHCS at First Montana Bank to promote its illegal prescription drug distribution business by having the revenue and profits from that business transmitted to ROCKLEY VENTURES in Barbados. For example:

<u>Count VIII</u>:  On or about May 16, 2011, Paul Bottomley wired $402,836.08 from account number XXXXX4540, held by MTHCS at First Montana Bank, to account number XXX5231, held by ROCKLEY VENTURES at the Royal Bank of Canada, Bridgetown, Barbados. The amount included proceeds from the sale of unapproved and misbranded drugs that were imported into the United States contrary to law.

All in violation of Title 18 United States Code, Section 1956(a)(2)(A), and Title 18 United States Code, Section 2.

Counts V-VIII are subject to a *Pinkerton* theory of liability.

## COUNT IX

18 U.S.C. § 1957

(Money Laundering – Transaction Over $10,000)

135.     Paragraphs 1 through 129 of the preceding sections are re-alleged and incorporated by reference as though fully set forth herein.

136.     In the District of Montana and elsewhere, Defendants, CANADA DRUGS, GLOBAL DRUG SUPPLY, ROCKLEY VENTURES, KRISTJAN THORKELSON, THOMAS HAUGHTON, and RONALD SIGURDSON, knowingly engaged in the following monetary transaction in criminally derived property of a value greater than $10,000 and derived from specified unlawful activity; that is, the knowing importation into the United States of merchandise contrary to law, in violation of Title 18, United States Code, Section 545; in violation of Title 18, United States Code, Section 1957:

137.     On or about March 15, 2011, Paul Bottomley wired $1,062,896.04 from account number XXXXX4540, held by MTHCS at First Montana Bank to account number XXX5231, held by ROCKLEY VENTURES at the Royal Bank of Canada, Bridgetown, Barbados.  The amount included proceeds from the sale of unapproved and misbranded drugs that were imported into the United States contrary to law.

43

All in violation of Title 18 United States Code, Section 1957, and Title 18 United States Code, Section 2.

Count IX is subject to a *Pinkerton* theory of liability.

## FORFEITURE ALLEGATION

138.     Paragraphs 1 through 137 of the preceding sections are re-alleged and incorporated by reference as though fully set forth herein.

139.     Pursuant to Federal Rule of Criminal Procedure 32.2(a), the United States gives notice to the Defendants that, in the event of a conviction of any of the offenses charged in Counts I-IX, the United States intends to forfeit the property further described in this Notice of Forfeiture.

140.     Pursuant to 18 U.S.C. § 982(a)(1), the Court, in imposing sentence on a person convicted of an offense in violation of 18 U.S.C. §§ 1956 or 1957, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.

141.     In addition, a defendant who is convicted of an offense in violation of 18 U.S.C. § 545, or a conspiracy to violate 18 U.S.C. § 545, shall forfeit to the United States, pursuant to 18 U.S.C. § 545, 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to such violation(s).

142.    The property to be forfeited includes, but is not limited to, the following:

(a) $78,184,482 million in United States dollars;

(b) TD Canada Trust account no. XXXX-XXX4500, in the name of 4208081 CANADA LTD.;

(c) Royal Bank of Canada (Barbados) account no. XXX5231, in the name of ROCKLEY VENTURES, LTD.;

(d) Lloyds TSB Bank, PLC, Nottingham, England, account no. XXXX8803, held by RIVER EAST; and

(e) Royal Bank of Canada (Barbados) account no. XXX2089, held by GLOBAL DRUG SUPPLY.

143.  If any of the property described above, as a result of any act or omission of any defendant,

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Sections 982(b)(1) and Title 28, United States Code, Section 2461(c).

All pursuant to 18 U.S.C. § 545, 18 U.S.C. § 981(a)(1)(C), and 982(a)(1) and 28 U.S.C. § 2461(c).

A TRUE BILL.          Foreperson signature redacted.  Original document filed under seal.

_____
MICHAEL W. COTTER
United States Attorney

_____
JOSEPH E. THAGGARD
Criminal Chief Assistant U.S. Attorney

Canada Drugs.com Ltd.
Partnership
Thorkelson Consulting, Ltd
420 8081 Canada, Ltd.
8/17/15 @   Rockley Venture, LTD
2:30 pm   Global Drug Supply, Ltd.
Jet-mesla   River East Supplies, Ltd
          Ram Kamath

Crim. Summons _____

Warrant: _____

Bail: _____

Kristjan Thorkelson
Thomas Haughton
Ronald Sigurdson
Troy Nakamura
Darren Chalus
Narinder Kaulder
James Trueman

46